This case is numbers 13-1615 and 1780. Is it V-I-C-I or how do you pronounce it? I say V-C. V-C, okay. V-C Racing, LLC v. T-Mobile USA, Inc. Mrs. Martin and Clark. Good morning, your honors. May it please the court, James Martin for Appellant T-Mobile. With the court's permission, I'd like to reserve three minutes. No problem at all. Your honors, as our briefing reflects, the district court's judgment awarding V-C $7 million in contract damages and attorney's fees finds no support in Delaware contract formation principles. Well, let me ask you a question. On the, I mean, if we're going to go to that point, 11.2 or 11, is it a liquidated damages provision or is it a limitation of liability? But I don't see anything that was either pled or put into evidence that 11.2 was not a liquidated damages provision, that it was a penalty or that the plaintiffs had to mitigate damages. Is there anything that was put in? Your honor, I think the argument was certainly made as a matter of law that the clause could not be a liquidated damages provision, and I'm not sure that the notion of putting in any evidence on that fell to T-Mobile. I mean, the arguments were made on the appellate briefing. Well, but your honor, to clarify, T-Mobile didn't have any burden in this appeal or in the trial court to deal with liquidated damages. If that clause was indeed a liquidated damages provision, that burden fell to V-C to prove it. The trial court obviously rejected the notion that. Well, it said it was ambiguous. Not as to 11.2, your honor. The trial court found as to 11.2 that even if the clause were construed as a liquidated damages provision, it would be a penalty. That's true as a matter of law anyway. Assuming it were a liquidated damages provision, the second payment of $7 million for 2011 was deemed to be a penalty by the district judge. Yes, your honor, but let's unpack that in two respects. First, it's not a liquidated damages provision on its face. It's a limitation of liability provision by its description and its terms. There is no case law that's been cited to this court that would suggest that a clause that sets a maximum amount of liability, as this one does by its expressed terms, could be torqued into a liquidated damages clause. No case has been cited to this court that suggests that. The law unanimously suggests that it can't. Well, come back with me. At the bench trial that was what, a four-day bench trial? Right. Was it argued that section 11 was not a liquidated damages provision? Your honor, it was not argued by T-Mobile that it was not, but T-Mobile didn't have the burden to do that. T-Mobile wasn't trying to prove or disprove liquidated damages. That burden fell to VC. But the other side at least made an argument that it was a liquidated damages provision. On the face of the clause, your honor, and on the face of the clause as a matter of law, it is neither a liquidated damages provision nor is it enforceable as a liquidated damages provision under Delaware law. That's subject to de novo review here, your honor, and there isn't any issue of waiver with respect to that either. No affirmative evidence, factual evidence of any kind was introduced by either party to establish that that provision, which on its face is not a liquidated damages provision, could be construed as one. Well, let's go to 5.8. Here's what I'd like you to answer, please. Why isn't the district court's ruling that 5.8 should be read out of the contract sufficiently explicit? That's one of the criticisms you have of it. Yes. Let me start, your honor, by saying that to look at 5.8, we have to divide the inquiry analytically into two steps. The first inquiry is whether within the four corners of the agreement, Section 5.8's language is going to be enforceable or it's too indefinite to enforce. All of the district court's specific findings went to that issue under the four corners of the agreement. Everything it had to say about the provision reflected that by its terms, Section 5.8 was neither complete enough nor direct enough to carry the interpretation that T-Mobile put on it. That's the first issue. Okay. The second issue is if it's too indefinite to enforce, your honor, and you're going to take it out of the contract, the issue is would the parties have formed an agreement without that provision? That's a separate and independent inquiry under Delaware law. Although it seems if that were, if it was so important, how in the world did it wait until the fourth draft before it was even brought into play? Well, your honor, let's look first at the standard that we're applying to the drafts. And it wasn't the fourth draft before telematics as an obligation came into play. But here's the problem that I'm really having with this, and this is what I'd like you to focus on. If you're saying that the telematic provision was so important to this contract, it almost seems, well, I was going to use a word I shouldn't use. I was going to use malpractice, but I won't. It seems odd, let's say odd, for there not to be a discussion about what's the obligation of Audi? What's the obligation of Volkswagen? What's the obligation of Porsche? Who's going to get involved in all of this? When is it going to happen? How is it going to happen? Who is obligated to do something? When are they obligated to do it, et cetera, et cetera? Yes, and your honor, let me again look at that from terms of the provision itself being enforceable or whether a telematics obligation was important to the parties' negotiations leading up to the agreement. Well, the court is saying, the district court was saying that based on what it had seen and heard, it was not essential. So obviously you're arguing it is, and tell me why. Okay, and your honor, just to fence with the preface to the question, there is no finding anywhere in this opinion. I know the word essential isn't there. Well, and nor is there any finding in this opinion that an objectively reasonable negotiator would have looked at the discussions leading up to this contract and been able to draw the conclusion that a telematics obligation of some kind was not important to the reason this agreement was reached. But that's the crux of my question, right? Isn't the essence of that? You write the exact words that you've just quoted are not there. But isn't the essence of that there? No, your honor, it's not. And the reason is, again, the inquiry is distinct. Would an objectively reasonable negotiator have thought that telematics was an important reason that this agreement was reached? Not as it ultimately got reflected in the contract. Was it enforceable? Was it important? That conclusion is inescapable from this record. What was the first thing that Mr. Meitner proposed as this whole thing started? It was a telematics proposition. The party's discussions and negotiations after that. Let me ask just to take off on Judge Greenway's question. The way you pose the second question, would the parties have entered this contract without that, isn't that a credibility finding? I don't think it has to be, your honor, on this record. First of all, the district court never undertook to make it. And it was the district court's. I think it's clear from her findings of fact that she rejected your arguments about 5.8 and she found that the parties had not come to any agreement that telematics had to be included, that a guarantee of telematics had to be included. I think the district court came to a conclusion that as a matter of fact, the telematics provision in the contract was unenforceable. But the entire front end of her opinion. That's a legal conclusion. But the foundation for that was her findings on credibility, that she didn't accept your client's version of the negotiations. Your honor, again, to look closely at her finding, her finding and her only credibility finding was not about the negotiations. It was about the meaning of Section 5.8 itself. She never made any finding related to what the negotiations revealed on the importance of telematics, not as it was reflected in the agreement, but to the reason the agreement was reached in the first place. That's the pivotal difference. And there's nothing to defer to there, your honor, the absence of a finding. It wasn't one of the pieces of evidence that came in, was one of the attorneys that looked at this had no idea why Section 5.8 was even put there? At the close of the discussions, the attorney asked about that. But that didn't mean that Section 5.8 up to that point, your honor, wasn't important to the party's discussions. But if it was essential, you think you would communicate it to the people that are negotiating on your behalf. Two things, it seems to me, are clear from this record in response to that, your honor. The first is that this contract would not have been formed without discussions about telematics and the inclusion of a telematics provision. That's the first proposal that VC made. That was the argument they made, and the district court rejected it. Isn't that a finding of fact? The district court rejected that Section 5.8 would be enforceable. It never made a finding of fact that telematics was not important to the reason this agreement was reached. And it was critical to that. But didn't the court make a, I don't have the page at the moment, but in the opinion, didn't the court say for normal sponsorship of a racing car, the parties have a variant view as to what it would cost. And there was talk about it would be $5 million a year. There was talk that Vichy had asked for $12 million a year, and obviously it was a negotiated term. That was one of the findings that the court made, as I recall. And in looking at that, one could say, well, if we put telematics aside, the numbers involved in the agreement reflect an agreement that is in line with what a normal sponsorship agreement would be, with regard to racing cars. Now, why doesn't that explicit finding implicitly say that telematics is not or was not an explicit term that the parties or explicit part of the agreement that the parties were negotiating? Three things in response to that quickly, Your Honor. First, that finding was not made. Second, this contract and its price is wildly out of line with other sponsorship. Keith, just have three minutes on this. His other sponsorship agreements. It was by a factor of three or four that the average of $5 million a year went well beyond sponsorship. And finally, Your Honor, the notion that the price factor here is reflective of the parties having reached an agreement only on sponsorship. In fact, it's reflective of the notion that there was a factor of consideration apportioned to telematics. There isn't any other objective way to look at this record. What's in the record that would reflect that the monetary agreement reached reflected an inclusion or consideration of telematics? What's in the record is the parties' discussions as chronicled by the district court that began with telematics and ended with a specific telematics provision in the contract. Admittedly, inartfully drafted, Your Honor, but not minimizing the importance. Second, looking at the price term alone. I want to stay on this. Right. On this very thing, right? What is it in the agreement that reflects a consideration of telematics? Well, the provision is in the agreement, Your Honor. One time. One word. Obviously, but one mention. The price of the agreement also reflects a consideration of telematics. And what is that? The maximum that V.C. What amount is reflected in the agreement that focuses on telematics? And where is it in the record? V.C. had received under this contract or would get for three years of sponsorship and telematics a total of $15 million, an average of $5 million per year. The most that V.C. had ever received for a primary sponsorship before was $1.6 million. This was three or four times higher than that. In paragraph 26 of the district court's opinion, she starts out by saying that what you are arguing here, this intention is not reflected in the four corners of the agreement. And then she goes on and cites from the record supporting that. And why aren't those factual findings that we have to accept? Because you accept those factual findings for the exact reason that Your Honor stated. Within the four corners of this agreement, the telematics provision is not enforceable. T-Mobile, you will not get to enforce it. But the essential term analysis starts right there. We put that behind us and we look at, okay, if we're going to form a new contract with sponsorship only, which, by the way, there is no evidence in the record, documentary or testimonial, that these parties would have reached a mutual contract for sponsorship only for $15 million. V.C. never produced that evidence. There's no document that would be attached to it. The contract itself doesn't say it. So now we have to look at how did we get to this contract in the first place? We got there because of telematics. There's no dispute about that in this record at all. The front end of the district court's opinion establishes it. If that were the case, normally, having once upon a time done a fair amount of drafting, you would put that in your recitals. You would put it front and center in another provision. You wouldn't bury it at the last provision of eight provisions in the sponsorship section of five. So, in other words, 5.8 was the only thing that even mentions the word telematics. The two things to that, Your Honor, price is only a single sentence in this agreement as well. So I don't think the idea that it's a single sentence or a single provision. But everybody understands that price is an essential term. We don't necessarily understand that telematics is an essential term unless there's something else that tells us that. And what tells us that, Your Honor, is everything about the negotiations leading up to this agreement. Everything about the negotiations fails to inform us with any specificity as to what the parties are expecting of each other. And with regard to those obligations, what those obligations mean in monetary terms. Right. What do they mean as far as obligations that are supposed to be delivered at particular times? I mean, there's none of that in there. So, you know, to say that, you know, every agreement before this, the most that BG ever received was 1.5 million. This was going to be an average of 5 million over three years. Therefore, there must have been a great consideration of telematics without any evidence in the record as to the who, what, where, when, and how anyone's binding Audi, Porsche, and Volkswagen. Is it, you know, in Europe? Is it in the United States? Is it, I mean, there is nothing that what we've read in the trial transcript that informs us with regard to any meeting of the minds. And that is the conclusion that the district court drew. And therefore, Section 5.8 was not going to be enforceable as T-Mobile construed it. But then we have to take the next step and say, is there a meeting of the minds on the contract that the court did find? Or would a contract only have been reached here with a telematics provision in it ineffectively drafted or not? When we pose that question, as I said, there is no evidence in this record that a sponsorship-only agreement would have been reached by these parties. And it is clear that the telematics provision was critical to the discussions. We'll get you back on rebuttal then. Thank you very much. Thank you very much. Mr. Klock. Good morning, Your Honors. Joe Klock on behalf of VC with co-counsel J.C. Antorcha and Christopher Lourizidis. Judge Greenaway, you asked a couple of questions. One of the things that's also significant, there's no definition of telematics anywhere in this agreement. You have to find telematics by looking at a footnote in their brief, which makes reference to a couple of Internet articles that appear in telematics. It's so critical that it's not defined. It's so critical that Volkswagen, which you referred to, is referred to as VW. The fact of the matter is that Judge Robinson had very careful findings of fact. Judge Robinson listened to the testimony. One question with regard to 5.8 only. It says VC grants to T-Mobile, in effect, the right to be the exclusive wireless carrier supplying wireless connectivity to the Porsche, Audi, and VW telematics program. What right did you have to grant? It says grants the right. What right did you have that you could grant? Well, the judge found, Judge Robinson. I'm asking you, what right did you have that you could grant? If that's how you interpret that clause, we have no right. But the fact of the matter is, Judge Robinson. I'm just looking at the words. I mean, VC grants to T-Mobile the right to be the exclusive wireless carrier supplying wireless connectivity. The judge found below that that was not capable of interpretation. And that was not appealed, Your Honor. The issue of that clause. I'm sorry, that was not what? Appealed. They didn't appeal that finding of the trial judge. The argument that they make, which is a very interesting argument, is forget about the fact that that clause is unintelligible and is not going to be enforced. You still have to consider whether or not it would have been included under this essentiality analysis that they do. That apparently the trial judge had an obligation with respect to a clause that she could not understand, admitted parole evidence to try to understand, and found that it was unintelligible. So the clause is unintelligible. Having found it's unintelligible, she then went to. Let's come back. What was the argument that you made at trial as to those words? I'm sorry, Your Honor. Grants to T-Mobile the right to be the exclusive wireless carrier. Mr. Meissner testified that it was his understanding that what he was supposed to do was simply to promote telematics. That's what he testified to. That's what the judge found. The judge found that his testimony was credible. The judge found that the testimony that was given by the T-Mobile witnesses was not believable. She didn't believe it. Okay. Let's go with that. We're going to believe Meissner, and the obligation is we're going to try to hook them up. If it works, great. But that's all we're doing. We have no obligation to, with any specificity, approach anybody at any of the car manufacturers and on behalf of T-Mobile establish concrete, contextual terms and so forth. All we've got to do is kind of introduce them. Now, one of the key points that I thought your adversary brought up that I'd like you to respond to is this. If there is a lack of specificity with regard to telematics, the economics of this agreement seem to be out of line with prior agreements that you've made for sponsorship-only agreements. So what is the consideration that requires essentially a sweeter deal, if you will, in this agreement now that Judge Robinson has determined, and you agree with Judge Robinson, that this is merely a sponsorship-only agreement? Well, first, Judge, respectfully, I would disagree. He did more than simply what you said he did. The fact of the matter is he did make various kinds of inquiries. He did promote them. But the fact of the matter is that there's more than ample evidence in the record. One of the things you have to take a look at, they completely abandoned damages at the trial level. You know, you raised the possibility of malpractice. It was a strategic decision. They decided to attack the contract. There was absolutely no attack whatsoever on damages anywhere in there, except when we came to Mr. Martin's excellent briefing. But what's the answer to his question? The answer to his question is that there was testimony that it was between $5 million to $7 million a year per car. The testimony was that he had spent various and sundry amounts of money. The idea that you need telematics. Well, let's just take a look at the telematics argument. Their argument that they use, of course, is that they're going to use telematics. I'm going to beg your pardon. Yes, sir. I'm going to interrupt you. Yes, sir. And I do earnestly beg your pardon. But my focus is this. If, and you'll tell me if the reference to the record is wrong, if in the past your client's sponsorship agreements have been in the $1.5 million per year area and now we're moving to $5 million, and this is only a sponsorship agreement as opposed to a sponsorship and telematics agreement, right? That's what the court found. Then what is that extra remuneration for? Well, Your Honor, the judge below entertained the witnesses. She looked at the witnesses. She made judgments as far as their credibility is concerned. The judge heard testimony. Why the increased amount here? What is your answer to that question? It's not an increased amount. He testified at one point in time he was negotiating $12 million for two cars per year. That's part of the testimony that's in the record. The fact of the matter is, is that if what you're going to do on appeal is try to parse different pieces of evidence below without considering everything the judge looked at. The judge looked at a whole bunch of different factors. She believed the fact that he had properly priced this thing. Okay, let's back up. Going to the prior to this agreement, the amounts that were given for sponsorship deals were approximately how much per deal? The only evidence that I recall being in there was not the primary sponsor or secondary sponsors, and they were anywhere from $100,000 to $700,000 or $800,000 is my recollection. And this deal was $7 million a year? This deal was $7 million for the primary sponsor, Your Honor. But the fact of the matter is, that's what they negotiated. Had they done any primary sponsorship deals prior to this? Judge, the record doesn't deal with that issue. The record deals with what the man was negotiating. Part of the testimony was he was negotiating with Verizon for $12 million a year. To your knowledge, had they done any primary sponsorship deals prior to this? The record doesn't indicate that, Your Honor. It doesn't touch upon that at all. I understand. To your knowledge, does the record indicate any primary sponsorship deals before this? No, Your Honor, it does not. But the fact of the matter is, the record that came up showed that as of the… So they had never done a primary sponsorship deal prior to this deal? The record doesn't indicate that one way or the other. Yes or no? To your knowledge? I don't know whether they did or not, sir. I only know what the record shows. I was a trial lawyer. I mean, I'm not his partner. Yeah, but one of the questions you would ask in preparing is, I mean, is they're going to try to show that telematics was the secret ingredient that caused this thing to be exponentially higher. And if you can show that that wasn't the case before, you would obviously use that. But, Your Honor… Or you didn't have any contracts before. Your Honor, they never raised that issue below. I mean, the fact of the matter is I can't anticipate what Mr. Martin is going to raise on appeal. All you can do is look at what happens in the trial court. We were the only ones that talked about value whatsoever. And at the point in time, Your Honor, that we sent out the letter indicating it was a default, they were already in default of a $7 million payment. So the issue is not at that point in time. The season ended at the end of September. There was a new season going. The judge found that he had already expended money and resources in the new season. The judge found below that $1 million was not enough for the first year and that the contract was back-ended. So what we have is a situation, it's what they negotiated, Judge. It's not as if we're dealing with, you know, the Soldiers and Sailors Relief Act. It's T-Mobile on the other side. T-Mobile had a clause in there that they claim is the sine qua non of everything, which basically reflects vigorous negotiating back at T-Mobile's headquarters among different people there and then just crossing their fingers and sticking behind their back. Let's go to the force majeure clause and then we'll end up with the damages provision at 11.2. Force majeure. How was the accident that occurred here? What actually happened? Car crashed in the race. In the race? Somebody hit it? I believe it hit a wall, but I don't know exactly what happened to it. And it was out for what, 45 days? Yes, sir. So that was four races? Yeah, I believe so. And did you argue that T-Mobile's failure to provide notice after the car crashed waived that breach? No, we provided notice as required in the contract. They never raised that, Judge. That issue wasn't raised. The fact of the matter is after you're aware, of course, there's a provision in the contract that if they think there's a default, they can declare default. They never did that. There's a provision to declare default, give us 30 days. Not only did they not raise any fuss about it, after that they appeared at later races and participated. All right. Let's go to the more important, 11.2. If both parties, the court said that both parties' interpretations of Section 11 were plausible, doesn't that mean that it's ambiguous and therefore you can't enforce it as a liquidated damages provision? I'm a little confused on that one, Judge. I don't recall that that argument was made below. I remember an argument being made about 5.8, but with respect to 11.2, the fact of the matter is that it is a liquidated damage clause. That's how it reads. And even though counsel indicated that it is his understanding. Actually, I'm not quite sure how it reads, to be honest with you. Go ahead. Go ahead, Mike. In Article 22, Judge Robinson refers to this as a quasi-liquidated damages provision. Do you defend that? Do you think that's right? Is there such an animal under Delaware law? No, sir. I don't believe so. Look, if you look at that language, it's relatively clear that it's a liquidated damage clause. It's not a cap on liability. But wait. It's entitled limitation, and I know that the title doesn't necessarily control, but it has a range from $50,000 to $15 million. So why? I mean, I'm not sure it's correct to say it's liquidated damages. But, Your Honor, if you read the clause, unless you want to be captured with the heading, in which case when you go back to 5.8 you have the same as cold sponsorship. But if you read the clause, the clause is a liquidated damage clause. It isn't a cap on liability. It's a liquidated damage clause because they are waiving other kinds of liability claims, which in the racing industry could be any number of things, that are being waived in exchange for this formula. And the formula is it's the higher of $50,000 or the payments due under the contract. And remember, the first payment was overdue. That gives the fact finder a tremendous range to find damages. But, Judge, respectfully, that's not the job of a trial judge when you have a liquidated damage clause. You don't sit around and try to figure out what the profit was and what the profit wasn't. And remember, again, they never said anything about damages at trial. They made a strategic decision to attack the contract. You've got a cross appeal for the failure for her to award the second $7 million. Correct. Isn't that right? All right. So, and that leads me on the next question. She says here in paragraph 45, VC did not present evidence as to its efforts to mitigate T-Mobile's breach. Do you disagree with that? No obligation to do that, Judge. And it's also an affirmative defense. Judge, again, Do you think you're entitled to that $7 million automatically? Absolutely. It's what they agreed to, Judge. We're talking about the second $7 million. Yeah, the second $7 million. I do, sir. Yeah, respectfully, I do. That's what they agreed to. It's not as if they're an unsophisticated negotiator. That's what they negotiated. And it's clearly a liquidated damage clause. And I disagree with it. The problem they have with 11-2 is it starts out, says, the maximum aggregate liability of either party. And the exclusive remedy shall be limited to $50,000 or the aggregate payments payable under this agreement. Whichever. Now, what helps you is whichever is higher. Right. That argues for liquidated damage provision. But the way it starts off is the maximum aggregate liability sounds like limitation of liability. Well, Judge, it could, except that in a limitation of liability clause, generally speaking, that's what you're doing. You're capping in terms of dollars. Okay? In this case, they're waiving different remedies that they can bring in exchange for those payments. And you'll notice also that there's a clause in there that indicates that the payment requirements survive the contract. That's in there, too. I mean, there's no question that that was negotiated between the parties. And there's also no question that nowhere below did they ever say squat about damages. They were trying to defend on the contract. That's the reason they did what they did. There's nothing, there's no mitigation claims, there's no argument about how much money was spent or not spent, there are no affirmative defenses raised as far as any of that's concerned. They say there's no contract. Let me ask you this question on the damages. So is it your position that you need not provide, for the record, expectancy with regard to the second $7 million because reading 11.2, you should, because of their default, automatically get the $7 million? That's correct, sir. That's what it says. That's exactly what it says. That's what they negotiated for. They never raised any arguments with respect to damages. They never raised any of the fine points that the panel here has raised during this oral argument. They tried to defend on the contract. They made a strategic decision. It was incorrect. They were wrong. And as a result, they paid the monies that they contracted to pay because our client forgo other kinds of claims that he could make in the event of a breach. That's what makes it a liquidated damage clause as opposed to a capital liability. So let me ask you this question. Why is it error for the district court to have decided looking at expectancy and looking at the dearth of any evidence in the record with regard to losses, lack of profits, lack of opportunity for the district court to say, okay, the total that's being sought is 14. I determine it's seven. Why is that error? Why did she do that? No, I didn't say why did she do it? I said why is it error? Why is it error? Because when you have a liquidated damage clause, all of those various factors you just discussed are not to be considered. That's what the case law in the third circuit says. When you have a liquidated damage clause, the only material amount is the liquidated damage. You don't sit around and figure out whether or not. The only question is whether or not it is, there's a basis for it, which there is in this case because of the waiver of other kinds of liability and the fact that it's hard to determine what the damages are and then whether or not it's reasonable or unreasonable. Is the court making a finding of fact that this 11.2 was a liquidated damages provision? I believe it's clearly a liquidated damage provision as it reads. No, no, no. Did the court make a finding of fact that Section 11.2 is a liquidated damages provision? She referred to it as a quasi-liquidated damage provision. I'm happy with that. And the fact of the matter is, again, this is a. . . Well, quasi because she only gave you 2010, the $7 million. No, the quasi-liquidated damage clause. Remember, the first $7 million doesn't have to depend on a liquidated damage clause. The first $7 million was past due. It was due to be paid on January 1. It wasn't paid. That was money paid. You don't have to. . . So that argues that 2011 was not a liquidated damages provision. I'm saying it doesn't. . . 2011 wasn't even quasi. It was not. Judge, I'm saying it doesn't have to be. It can be justified on the fact. . . My question is, did the district court make a finding of fact that for 2011, the $7 million that otherwise would have been due was a liquidated damages provision? Answer, has to be no. She did not make that finding of fact because she didn't award it. That's correct. She said it was earned. She then said, assuming it's a liquidated damages provision, it's a penalty and she's not going to enforce it. You're talking about the second $7 million. Yeah. For 2011. Yeah, the second $7 million. But if it is a liquidated, you go. . . Perhaps the analysis in the Dow case that was handed up from the District of Delaware is helpful in that respect, where they do the analysis of what is reasonable and what's unreasonable. If what the judge said was, look, I think that that's an unreasonable amount of money. She said it was void against public policy. I'm not quite sure why she said that. But under the normal analysis you would do with liquidated damages, the only question on the second prong would be, is it unreasonable? Is it too much? Okay? Now, she didn't indicate that she thought it was void against public policy. Perhaps she's saying it's too much. But the fact of the matter is. . . It's unreasonably large. But she did say. . . And it might be void against public policy. But that's a question of law, and it's a question of considering. If it is a liquidated damages clause, then the judge is saying that. Okay? If you'll also recall that the judge pointed out that the contract was back and loaded. So the fact of the matter is the payments were not on a proportional basis. $1 million the first year, $7 million the second two years. That was your basis for giving you $7 million. I mean, there's an argument that if you did some sort of quantum merit analysis or sort of time value analysis that you wouldn't. But that's why she gave it to you, the first $7 million. She gave us the first $7 million, I believe, because it was earned and due on January 1. That was the reason she did that. She also talked about. . . She had findings with respect to the other points. The issue, Judge Greenway, when you get back down to it, is it or is it not a liquidated damages clause? That's a question of law. Looking at that language. Unless you find that that clause is ambiguous and requires outside testimony, which I don't believe it does. The fact of the matter is it is a liquidated damages clause, and as your honors are well aware, with liquidated damages clause, you do not get into that analysis of whether or not damages are earned or not earned. The only issue is whether or not, on a second prong test, it's too much. If it shocks the conscience, as in the Dow case, where Dow was trying by waiting from December 31 to January 15, they were going to get another year's worth of damages. So you agree with the simple proposition that if we agree with her that it meets the shocks the conscience test, that it's at least from a legal standpoint we can affirm her. I can't disagree with that. But at the same time, I don't think, based on everything that's in the record and other findings, that that is the case. I believe she had other reasons for doing that. But just as a pure legal proposition, you agree. Yes. I have to. Judge Baleson has a question. Just one question. Yes, Your Honor. Do you agree that Judge Robinson applied what I believe is referred to in Delaware law as expectation damages? No. Thanks. Is there a difference between the costs and losses, let's say, of the $7 million that you actually avoided, that is money you saved, and the costs and losses that could have been avoided, that is money you lost? Judge, again, what you're doing is that you are going behind. None of these defenses were raised. You may be right, but all I'm saying is if it's not a liquidated damages provision, don't you have to take the $7 million and deduct from it the cost that you otherwise saved? Only if the defendants raise that as an affirmative defense, Your Honor. And the fact of the matter is that Judge Robinson heard testimony and she was satisfied with respect to the expenditures that have been made and the value there. It is not the job of Judge Robinson or this Court to fill in for lawyers who make a strategic decision to defend on liability and to ignore damages. Thank you. Thank you, Your Honor. Thank you. Mr. Martin. Yes, Your Honor. First of all, on primary sponsorship and evidence in the record, I would point the Court to our trial briefing at JA 1364-65 and then specifically also JA 1227, and the Court will see that there are no primary sponsorships that come near $5 million a year. Looking next at the expectancy damages issue, that clearly is the basis on which the District Court purported to award expectancy damages. VC put in no affirmative proof on that issue, and this award flunks Delaware law as a matter of expectancy damages. It is not an issue of mitigation. It is not a question about waiver of a defense. Under Delaware law, the costs avoided that Judge Ambrose referred to are part of the affirmative measure of damages, and VC cannot get $7 million free and clear without costs for racing, which was its obligation under this contract. That award is not defensible. When we turn to liquidated damages, counsel said this is a question of law. Now, to clarify, we don't have a burden of proof on damages. We could sit back in this trial and do nothing. The question about whether this damage award is just a final award. I think their argument is they don't have to do anything because it is a liquidated damages provision they contend. Which they said was a question of law, Your Honor. We agree with that. There's no factual testimony on this in the record. As a matter of law, that clause is not a liquidated damages clause as you read it, or because it would impose an unconscionable penalty which Delaware law won't allow. Back to the- I'm sorry. Can I go back to just one question? On the initial $7 million that you say there should have been a deduction for costs, the record showed that VC had spent a lot of money to get ready for the race before your first $7 million was due on January 1, 2010. And that date passed without you doing anything. You didn't terminate. You didn't pay the money. You didn't send them any letters or do anything. So what was wrong with her awarding a flat $7 million? Why does she have to make a deduction for costs when they had already spent a lot of money to get ready and they were expecting your $7 million. Right. And they didn't get it. Your Honor, two things. There is no evidence in the record that they spent a lot of money. That's an argument. It's not fact. Mr. Meisner testified about that. Mr. Meisner testified in a conclusory fashion. There was no substantiation for it and no proof. This $7 million can't be- Did you raise that? I don't recall seeing that in your appellate brief. But, Your Honor, that's because the expectancy damage issue came up for the first time in her opinion, and we did raise that in our appellate brief. It was not in your post-trial brief. It wasn't in our post-trial brief because the judgment was the first time that expectancy damages became a part of this case. Prior to that, VC had argued only and attempted to prove only that this was a liquidated damages provision. They did not introduce any evidence on expectancy damages, which was their affirmative burden. What we have shown on appeal, Your Honor, conclusively, is that somewhere in the neighborhood of $2.5 to $5 million was the cost for racing this car or two cars in a year, and the district court did not account for that. There is no expectancy calculation in this verdict, and that's reversible error. Well, let me ask you this. Your brief says $2.5 to $5 million per season for one car. Now, she went through an analysis. We can argue about whether it was a pure or correct expectancy analysis, but you certainly could argue that she comes out in about the right place in this sense. If the assumption is that for one car you would be in the area of $2.5 to $5 million per car per season and she looks at the life of the contract as three years, which means that's $7.5 to $15 million for the life of the contract, she says, you know, we're not through the entire life of the contract, $7 million is about right. Why isn't that? I understand it might not be as exacting as you'd like. I get that. But in the end, it ends up in about the right place. Why isn't that? Your Honor, for two reasons. First, I want to bring Rule 52 to bear here. Those specific findings are required. We can't do this by inference or intuit. And second, you can't get there from here. There isn't any evidence in the record that calls this rough justice or even justice on the Court's intuitive analysis because the District Court never went through those specifics to show what costs were avoided, incurred, or anything else. And we would be speculating here on that. And you cannot affirm a $7 million damage award on speculation. This Court has to reverse it. It would have to be a liquidated damages provision, in other words. If it were liquidated damages, you wouldn't have to mitigate. That's correct, but mitigation is not avoidance. Avoidance is part of the measure of damages. Mitigation is the defense. I have one more question. Yeah, go ahead, Joe. You said a moment ago that 11.2 is not a liquidated damages provision as you read it. Please tell me why. Because it doesn't set a sum certain in the event of a breach. It talks about a maximum allowable award of damages and a range of damages. The section also sets forth. Well, it says whichever is higher. That kind of hurts you. It sets forth a burden of proof within that range, Your Honor, and that's what the case law says. It's $50,000 or the remaining amount, let's say $14 million here, whichever is higher. Right. And it's losses arising from. So the clause itself has a burden of proof to bring the party within the range. And, again, pointing to the cases that we've cited, where a clause is labeled limitation of liability, it follows through on setting a range of limitations. What does whichever is higher mean then to you? It means that the maximum end of the range, if the proof is available, is the contract measure. No, but it's already there. If the words whichever is higher are left out, you still have a maximum end of the range. But you still have a range within which the party has to make proof. If you don't automatically entitle somebody to that sum certain, otherwise the provision would be written differently. It would say if there's a breach, you get it. And liquidated damage provisions. I'm lost. Okay. If the maximum end of the range, let's say it's $14 million, or when it was at the beginning of the contract, $15 million, and you don't need, you can put a period there. But it says $50,000 and the aggregate amount remaining due under the agreement, which is, in this case, $14 million, comma, whichever is higher. What does whichever is higher mean? You've already told me that the maximum end of the range is $14 million. Right. And if the other end, the lower end, was higher, you would get that. I mean, I think it only sets the outer limit of the range within which the proof is to fall. But doesn't that at least tell you that 11.2 is a liquidated damages provision? No, Your Honor, because it still compels proof within the range and so that's, first of all, what the provision says on its face. Second, if we look at the law that deals with liquidated damages provisions, certainty in the amount for a breach is required at a bare minimum. And finally, even if we get past this analysis, there's no doubt that imposing that in this instance for a termination is a penalty, just as the district court said, and Delaware law wouldn't get past that. It's almost, I don't know what was in the minds of everyone, but when you read it, it almost sounds like it's a combination of a liquidated damages provision and a limitation of liability provision. Well, the court shouldn't be straining it to read it as a liquidated damages provision, Your Honor, particularly given the label. And so I think as a matter of law, the case law that we've cited establishes that it's not. That should be the exception, not the rule, and the court should end up right where we say, which is I'll give you one last chance to tell me whichever is higher. What does that mean? I think it just sets the outer end of the range, Your Honor. It's already set. But it's already set. I mean, are you saying it's just superfluous? It is in the sense that the contract has specific numbers in it, but Let me just give you sort of a silly hypo. Let's say these parties had gotten into this contract and you alleged that the VC had not sent you a check for $1,000. That was duty. You had spent that, and you sent them to say, we want reimbursement for this $1,000. And they took you to small claims court, and they proved that you owed them this $1,000. Under this clause, does that mean that even though they only lost $1,000, you'd have to pay them $50,000? No, I don't think so, Your Honor. Well, then what is whichever is higher? Okay. Then under that analysis, let's assume that that is recoverable within the clause under 11.2. I don't think that it is conclusive that they get the 50, but if it is, that would be a penalty in that situation, and you would never enforce it as a matter of liquidated damages. $50,000 for a $1,000 loss proves my point. So even if the clause is read to provide for these sums to certain without proof or with short proof, Delaware law is not going to enforce this clause. Thank you very much. Thank you to both counsel. We'll take the matter under advisement. We'll take about a 15 to 20-minute break before we come back with the next set of cases. Thank you.